UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

AMERICAN CENTER FOR LAW AND
JUSTICE,

      *Plaintiff*,

  v.

DEPARTMENT OF STATE,

      *Defendant*.

Civil Action No. 16-1355 (TJK)

## MEMORANDUM OPINION

This action, filed by the American Center for Law and Justice ("ACLJ") under the Freedom of Information Act ("FOIA"), concerns records relating to a portion of a video of a press briefing held by the State Department on December 2, 2013. At the briefing, a reporter had pressed then-State Spokesperson Jennifer Psaki about whether the Obama Administration had held secret direct bilateral talks with Iran in 2011 and whether Psaki's predecessor had lied to the press about whether those talks had happened. Then in May 2016, the reporter apparently discovered that Psaki's exchange with him had been deleted from the online video of the briefing, without explanation.

The Court refers the parties to its prior opinion, with which it assumes familiarity and incorporates by reference, in which it resolved almost all the issues in the parties' previous set of cross-motions for summary judgment. *ACLJ v. Dep't of State*, 330 F. Supp. 3d 293 (D.D.C. 2018). That opinion sets forth the factual and procedural background of the case, the relevant legal standard, and the Court's analysis of the contours of the FOIA exemptions asserted by State. At that time, the Court granted summary judgment in State's favor as to the exemptions asserted (and on segregability) for all documents at issue except three, about which it held it did

not have enough information to assess the exemptions' propriety. Thus, it allowed State to submit additional declarations and *Vaughn* indices, and the parties to submit renewed motions for summary judgment, relating to those three documents, to which it now turns. For the reasons explained below, the Court will grant State's motion as to two of the remaining documents and grant ACLJ's motion on the remaining document for which State asserted the presidential communications privilege.

I.      Analysis

    A.      Document C06206248

The first document at issue, Bates-labelled C06206248, is one of seven May 9, 2016 email threads that contained discussion between State officials about how it should respond to the reporter's inquiry about the missing portion of the video. ECF No. 37-4. In its first motion, State argued—and the Court agreed—that the deliberative process privilege covered six of the seven threads, and that State was therefore justified in withholding them under FOIA's Exemption 5. 330 F. Supp. 3d at 303–04. For the deliberative process privilege to apply, two conditions must be met. The withheld material must be "both 'predecisional' and 'deliberative.'" *100Reporters LLC v. DOJ*, 248 F. Supp. 3d 115, 150 (D.D.C. 2017) (quoting *Access Reports v. DOJ*, 926 F.2d 1192, 1194 (D.C. Cir. 1991)).

The Court withheld judgment on this document, however, which includes a "redacted email in which [a State official] confirmed to her colleagues that she had spoken to [the reporter]" because "[e]mails both *prior to* and *after* this confirmation email are redacted." 330 F. Supp. 3d at 304 (emphasis in original). Thus, the Court could not tell "whether the privilege [applied] to the confirmation email, and the emails sent afterwards; obviously, these documents [were] not predecisional with respect to State's response to [the reporter's] inquiry." *Id*. Still,

2

the Court noted, it was "possible that the privilege [did] apply" if, for example, "the emails contain[ed] discussions about a follow-up response to [the reporter], or about how to handle press inquiries on this topic in general." *Id.*

After the Court issued its opinion, State released the confirmation email to ACLJ without redaction. ECF No. 37-1 at 7. And as for the emails that followed the confirmation email, State submitted a new affidavit to the Court explaining that it redacted the information in them "because it reflects officials' recommendations about how to engage the reporter moving forward and how to respond to any follow-up inquiries from the reporter." ECF No. 37-2 ("3d Stein Decl.") ¶ 14. And ACLJ, for its part, just argues that the Court got it wrong the first time. ECF No. 42 at 2–3. For all these reasons and those explained in its prior opinion, the Court holds that Document C06206248 is covered by the deliberative process privilege and thus State properly withheld it under Exemption 5 and fulfilled its duty to provide all reasonably segregable information.

**B.     Document C06189797**

The second document at issue, Bates-labelled C06189797, is a May 10, 2016, email thread in which two employees in State's Bureau of Public Affairs Office of Video Services discussed a news report about the edited video. ECF No. 37-5. In its first motion, State argued that the deliberative process privilege, and thus Exemption 5, covered information redacted from the email thread challenged by ACLJ. 330 F. Supp. 3d at 305. But the Court held that State had "not shown that the deliberative process privilege applies to this material, because it [had] not alleged that it was part of a process through which an agency decision or policy was formulated." *Id.* at 305–06.

3

After the Court issued its opinion, State reviewed the email thread further and decided, instead, to assert Exemption 6 to justify some of the redactions ACLJ had challenged before. ECF No. 37-1 at 1–2.  Exemption 6 provides that agencies may withhold "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6).  State asserts that the only information withheld under this exemption is the name of a State employee about whom State employees had (wrongfully) speculated had edited the video.  ECF No. 37-1 at 9; 13–16.  State also continues to justify under Exemption 5 what appears to be one final redaction, by explaining that the employees were responding to an inquiry by the head of the Office of Video Services about what had happened. *Id.* at 9–10.  And, State asserts, that official later wrote a memorandum to his superiors based in part on information he received from his employees.  *Id*.

In the end, though, the Court need not pass on either of State's justifications.  ACLJ represents that, given State's representations, it has withdrawn its challenge to the material withheld under Exemption 6.  ECF No. 42 at 9.  Moreover, ACLJ makes no argument in its motion, opposition, or reply about the remaining redaction justified under Exemption 5 and so the Court considers its challenge to that withholding withdrawn as well.  *See Nat'l Day Laborer Organizing Network v. U.S. Immigration & Customs Enforcement*, 811 F. Supp. 2d 713, 738 (S.D.N.Y. 2011) (entering judgment for defendants where plaintiff opted not to challenge assertion of FOIA exemptions).

C.     **Document C06190112**

The third and final document at issue, Bates-labelled C06190112, is the one on which the parties spill the most ink in this last round of briefing.  It is a December 4–5, 2013, email chain involving National Security Council official Bernadette Meehan, White House official Ben

4

Rhodes, Psaki, State's Deputy Spokesperson Marie Harf, and a reporter, about press guidance and strategy related to Iran. ECF No. 37-6. The thread began with an exchange between the reporter and Meehan. The reporter asked about an alleged "face-to-face meeting with Iranian officials in Oman in July 2012." *Id*. Meehan "decline[d] to discuss/confirm anything further related that channel." *Id*. She then forwarded the exchange to Psaki and Harf, and copied Rhodes. *Id*. State redacted almost all of Meehan's message to the group in her forwarding email. *Id*. Psaki then replied to Meehan by stating, "[h]appy to and we will also work to shut [another person] down." *Id.*

In its first motion, State argued that the redacted material was covered by the presidential communications privilege, and thus that State was justified in withholding them under FOIA's Exemption 5. 330 F. Supp. 3d at 308. The Court held that the State official who had submitted a declaration could determine that the privilege applied, but that it did not have enough information about the redacted material be able to say whether the information was covered by the privilege. *Id.* at 308–10.

State has now submitted another *Vaughn* index and declaration that, combined with its prior submissions, provides more information about the redacted material. ECF No. 37-2. In summary, the redacted material was sent by Meehan, a "[National Security Council] official" to Psaki and Harf, with a copy to Rhodes, a "White House official." ECF No. 31-1 at 4. Meehan and Rhodes were "presidential advisors" who "advised the President on, among other things, how to present and explain Iran-related policy to the public." *Id.* The redacted information includes "details about the subject and timing of an inter-agency government meeting, involving high-level officials in the administration's foreign policy and national security teams, pertaining to Iran that took place shortly before the e-mail exchange." ECF No. 37-2 at 8. More

specifically, "the withheld information also includes details about the decision reached in that meeting concerning the administration's response to the press reports regarding U.S.-Iran talks—the subject of the December 2, 2013, press briefing video—and how to communicate Iran-related policy to the public." *Id.* at 8-9.  The meeting at issue was convened within the framework established by Presidential Policy Directive 1 ("PPD-1"), which "laid out the organization of the [National Security Council] system under the Obama administration." *Id.* at 9.  The framework's "stated purpose was to 'assist [President Obama] in carrying out [his] responsibilities in the area of national security.'" *Id.*  Moreover, State emphasizes, the framework was established to "consider[] . . . national security policy issues requiring Presidential determination."  ECF No. 52-3.

The presidential communications privilege "preserves the President's ability to obtain candid and informed opinions from his advisors and to make decisions." *Loving v. Dep't of Def.*, 550 F.3d 32, 37 (D.C. Cir. 2008).  It "applies to communications made in the process of arriving at presidential decisions," and it protects those communications in their entirety.  *In re Sealed Case*, 121 F.3d 729, 745 (D.C. Cir. 1997).  Thus, the privilege protects "communications directly involving and documents actually viewed by the President" during that process of shaping policies and making presidential decisions. *Judicial Watch, Inc. v. Dep't of Justice*, 365 F.3d 1108, 1114 (D.C. Cir. 2004).  That said, the privilege also extends to communications "'solicited and received' by . . . 'immediate White House advisers,'" *i.e.*, those with "'broad and significant responsibility for investigating and formulating the advice to be given to the President.'" *Loving*, 550 F.3d at 37 (omission in original) (quoting *Judicial Watch*, 365 F.3d at 1114).  And the privilege covers "communications made by presidential advisers in the course of preparing

6

advice for the President . . . even when these communications are not made directly to the President." *In re Sealed Case*, 121 F.3d at 752.

The Court holds that State has not met its burden of showing that the redacted material is covered by the presidential communications privilege, and thus may be withheld under Exemption 5. The record lacks information from which the Court can conclude that the meeting described in the redacted material was convened by an immediate presidential adviser for the purpose of advising the President.

As for whether the meeting was initiated by an immediate White House adviser covered by the privilege, the record is almost entirely bare. While State does make representations about the status of Meehan and Rhodes as presidential advisers, nowhere does the record reflect that either of them called the meeting—or even attended it. Their only confirmed role in these events appears to be that they were involved in passing on a decision reached at the meeting to Psaki and Harf at State. Thus, their status appears irrelevant to whether the privilege attached to the contents of the meeting in the first place. State seems to argue that because the meeting was convened within the National Security Council framework, it must have been called by an immediate White House adviser covered by the privilege. Maybe. But even if the Court could find that whoever called the meeting must have been close enough to the President for the privilege to attach, on this record the Court cannot find that the meeting was called for the purpose of advising him, for several reasons.

First, the burden is on State to show that the privilege applies, and there is no affidavit in the record declaring that the specific meeting at issue was called to advise the President. The Court knows of no reason why it should excuse State's failure to present direct evidence, by its nature within State's control, about this key prerequisite for the presidential communications

7

privilege to attach. Neither party has pointed the Court to any case in which a court simply assumed, without an affidavit in the record saying so, that a meeting was convened, or a document was written, for the purpose of advising the president, when evaluating a claim that the meeting or document fell under the presidential communications privilege.

Second, if anything, the circumstances here reflect the likelihood that the meeting was not called for that purpose. The Court finds it revealing that a key decision that appears to be the reason State is asserting the privilege was made at the meeting in question. And State has, conspicuously, not represented that the President participated in the meeting. To be sure, as discussed above, if the meeting was convened for the purpose of advising him, the President need not have attended it for the privilege to attach. But assuming the President did not participate, and without any further explanation from State about how the meeting connected to his decisionmaking, it seems unlikely that the meeting would have been called to advise him on a matter that the participants resolved right then and there, without him. In addition, that the decision concerned how to address "the administration's response to the press reports regarding U.S.-Iran talks" and "how to communicate Iran-related policy to the public" does not, on its own, suggest presidential decisionmaking.

State argues that the Court should infer that the meeting was called to advise the President because (1) the meeting took place under the National Security Council framework; and (2) the subject of the meeting was Iran policy, which was—especially at the time of these events—a foreign policy issue highly important to President Obama. ECF No. 51 at 12:1–5, 24:9–15. But especially on the record here, the Court cannot make that leap. That the meeting was convened under the PPD-1 framework—established to consider national security policy issues requiring presidential determination—does not mean *everything* that happens under that

framework necessarily involves a presidential decision.  Moreover, that the meeting was called to address press reports and the Administration's response to them does not necessarily suggest that presidential decisionmaking was involved, even if Iran policy was a key priority for President Obama.  To be sure, the Court accepts that press strategy *can* be a part of diplomacy and presidential decisionmaking.  But there is no indication that it was in this case.

Two recent cases in this District involving the government's invocation of the presidential communication privilege in the context of the National Security Council show why State has not met its burden here.  First, in *Protect Democracy Project, Inc. v. U.S. Department of Defense*, 320 F. Supp. 3d 162, 170–175 (D.D.C. 2018), the court found that an opinion solicited by the Deputy National Security Legal Adviser at the National Security Council and written by attorneys from State (among others) was covered by the privilege.  But in that case, the record included an affidavit attesting to the fact that the adviser solicited the opinion "for the purpose of providing advice and recommendations to the President and other senior executive Branch officials regarding the legal basis for potential military action."  *Id.* at 174.  There are no such representations in the record here.  And while the record in that case did not provide any details about the role the opinion had in the President's decision, the decision itself—"whether to attack a foreign nation"—further assured the Court that "even if the President were not a party to the communications over which the government is asserting presidential privilege, these communications nonetheless [were] intimately connected to his presidential decisionmaking." *Id.* (quoting *In re Sealed Case*, 121 F.3d at 753).  In contrast, what *is* in the record about the key decision here—that the participants reached it at the meeting (with no indication the President attended in the meeting) and that it involved how to respond to press reports—does not provide a

similar assurance that the communications at issue were intimately connected to presidential decisionmaking.

Second, in *Property of the People, Inc. v. OMB*, 394 F. Supp. 3d 39 (D.D.C. 2019), the court held that calendar entries relating to a series of National Security Council meetings that included Council members who were *also* cabinet officials or agency heads were protected by the presidential communications privilege. But again, in that case, the record included an affidavit from an official with personal knowledge (based in part on her attendance at some of the meetings) that the meetings were held for the "purpose of formulating advice to the President with respect to presidential decisions." *Id.* at 49. To be sure, that decision also contained a thorough, and persuasive, analysis of why the National Security Council meetings at issue, even though they included members with roles outside the Council, were "solicited and received" by immediate White House advisors. 394 F. Supp. 3d at 44–48. But the Court did not consider that a substitute for ensuring that those meetings were also intimately connected to presidential decisionmaking, evidence of which is lacking here.

## IV.   Conclusion

For all the above reasons, the Court will grant State's motion (and deny ACLJ's) as to two of the remaining documents and grant ACLJ's motion (and deny State's) on the remaining document for which State asserted the presidential communications privilege. A separate order will issue.

/s/ Timothy J. Kelly
TIMOTHY J. KELLY
United States District Judge

Date: April 23, 2021